Richard M. Garbarini (RG 5496)
GARBARINI FITZGERALD P.C.
250 Park Avenue
7th Floor
New York, New York 10177
Telephone: (212) 300-5358
Facsimile: (347) 218-9478

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

YESH MUSIC, LLC, and JOHN K. EMANUELE,     Index No.: 16-cv-866
individually and on behalf of all other similarly
situated copyright holders,     **CLASS ACTION COMPLAINT AND JURY DEMAND FOR DAMAGES FOR COPYRIGHT INFRINGEMENT AND UNDERPAYMENT OF ROYALTIES**

        Plaintiffs,

        v.

SLACKER, INC.,

        Defendant.
------------------------------------------------------------x

     Plaintiffs YESH MUSIC, LLC and JOHN EMANELE by and through their attorneys at

GARBARINI FITZGERALD P.C., bring this Class Action Complaint and Jury Demand against

Defendant SLACKER, INC. based on Sub-Class I - Defendant's systematic infringement of

Plaintiffs' and the Putative Class' copyrighted musical works pursuant to the Copyright Act and

Copyright Revisions Act, 17 U.S.C. §§ 101 *et seq*. (the "Copyright Act" or "Act"), and Sub-

Class II - Defendant's material breach of the calculation of the compulsory royalty rates owed

Plaintiffs and the Putative Class of copyright holders that received royalties.

## NATURE OF THE ACTION

     1.     Defendant SLACKER operates a subscription interactive internet streaming

service (the "SLACKER Music Service" or SLACKER Service").

2.      The SLACKER Music service is subject to § 115 of Title 17 of the United States Code.  As such, Defendant SLACKER was required to serve a Notice of Intent to Obtain Compulsory License ("NOI"), in the form proscribed by 37 CFR § 201.18, within thirty (30) days from the date each copyrighted musical composition was included on its service.

3.      Plaintiffs are the beneficial rights holders to one hundred and eighteen (118) copyright registrations covering one hundred and forty eight (148) musical recordings which Defendant has reproduced and distributed through the SLACKER Service without a license.

4.      Federal Rule 23(c)(4)(B) allows: "[w]hen appropriate . . . a class [to] be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly."  Plaintiffs propose two classes in this action.

5.      Sub-Class I of this action is brought by Plaintiffs, on behalf of themselves, and the numerous other similarly-situated holders of the publishing rights, referred to as the "mechanical rights", in copyrighted musical works which Defendant SLACKER has used without license. Defendant SLACKER's systematic failure to obtain mechanical licenses is part of an egregious, calculated, and ongoing campaign of deliberate copyright infringement.

6.      Specifically, Defendant SLACKER has (and continues to) unlawfully reproduced and/or distributed Plaintiffs' and the Putative Class' copyrighted musical compositions (the "Copyrighted Works") to millions of users via its interactive commercial music streaming service, as well as its offline listening service.

7.      Defendant SLACKER reproduced and/or distributed the Copyrighted Works despite its intentional failure to identify and/or locate Plaintiffs and the other owners of those

compositions for payment or to provide them with notice of SLACKER's intent to reproduce and/or distribute the Copyrighted Works.

8.      SLACKER's infringement of Plaintiffs' and the Putative Class Members' mechanical rights was, and is, knowing and willful.

9.      SLACKER reproduced and/or distributed the Copyrighted Works without first obtaining appropriate authorization or license.  Such use of the Copyrighted Works creates substantial harm and injury to the copyright holders, and diminishes the integrity of the Copyrighted Works.  SLACKER is liable for its intentional infringement for $150,000 per copyrighted work, but in no case less than $30,000 per work.

10.      Sub-Class II of this action is brought by Plaintiffs, individually and on behalf of all holders of publishing rights to copyrighted musical works which Defendant SLACKER has systematically underpaid royalties by deliberately miscalculating the per-stream royalty rates it has paid since February 22, 2013.

11.      Defendant SLACKER had a statutory obligation to pay a per-stream rate for each musical composition streamed on its SLACKER Music service as well as provide an accurate accounting.  To put it simply, the per-stream rate is calculated as a percent of the subscription revenue divided by all lawful streams on the service which Defendant pays royalties.  Defendant SLACKER deliberately obfuscated the correct number of streams used in the calculation by including tens of millions of streams it was not paying royalties in a deliberate move to reduce the per-stream rate to all artists that receive mechanical royalties, including Plaintiffs.  Defendant then failed to provide an accurate accounting to Plaintiffs and the Putative Class.

12.     This action is necessary to protect the property rights of Plaintiffs and all others similarly situated holders of the publishing rights who have been damaged due to Defendant SLACKER's calculated and unlawful infringement, and reduction in the per-stream rate to all publishing rights holders who received royalties from Defendant's interactive streaming product.

13.     Plaintiffs bring this action on behalf of themselves and all others who have similarly suffered injury to their property as a result of Defendant's unlawful practices.

## PARTIES

14.     At all times material hereto, Plaintiff Yesh Music, LLC ("YESH") was, and is, a limited liability company organized under the laws of the State of New York, with its principal offices located at 75-10 197th Street, Flushing, New York.  YESH is engaged in, among other things, the business of music publishing and otherwise commercially exploiting its copyrighted sound recordings of the band *The American Dollar*.  The sole members of Plaintiff are Richard Cupolo and John Emanuele, who are also the sole composers of the Copyrighted Compositions.

15.     At all times material hereto, Plaintiff John K. Emanuele ("EMANUELE") was, and is, an individual and resident of Queens.  EMANUELE released two collections of songs under the name "Zero Bedroom Apartment", which Defendant elected to make available to the public without service of an NOI or payment of royalties.

16.     Plaintiffs are informed and believe, and on that basis aver, that Defendant SLACKER, INC. ("SLACKER") is a Delaware corporation with a headquarters in San Diego. SLACKER develops, markets, distributes, and licenses computer software as well as owns and operates the SLACKER Service which is an interactive music streaming service.

## JURISDICTION AND VENUE

17.     The jurisdiction of this Court is based upon 28 U.S.C. §§ 1331 and 1338 in that this controversy arises under the Copyright Act and Copyright Revision Act of 1976 (17 U.S.C. § 101 et seq.).  This action is a civil action over which this court has original jurisdiction.

18.     Jurisdiction also exists pursuant to 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the sum or value of $5,000,000 (exclusive of interest and costs), is a class action in which a member of the proposed class, including Plaintiff, is a citizen of a state different from Defendant SLACKER, and the number of members of the proposed class exceeds 100.

19.     On information and belief, a substantial part of the facts of infringement complained of herein occurs or has occurred in this District, and Defendant is subject to personal jurisdiction in this District.

20.     Personal jurisdiction over Defendant SLACKER is proper in this Court, among other reasons, on the grounds that SLACKER through its interactive web-based subscription service which caused the unlicensed distribution of the Copyrighted Compositions throughout the State of New York, including within this Judicial District.  SLACKER has music stations aimed at New York like the 'Voices of New York".  Other wrongful conduct alleged herein, occurred, in part, in the State of New York and in this Judicial District.

21.     The Court has personal jurisdiction over Defendant SLACKER pursuant to CPLR § 302 (New York's long-arm statute) due to its continuous and systematic business activities within New York as described below.

22.     Venue in this District is proper under 28 U.S.C. § 1391(b) and (c) and/or 28 U.S.C. § 1400(a).

23.     Plaintiffs have the right to bring the within action pursuant to 17 U.S.C. § 501(b).

24.     Copies of each certificate issued by the U.S. Copyright Office to Plaintiffs and assignments registered with the U.S. Copyright Office are annexed and incorporated hereto respectively as **Exhibits A** and **B.**  Alternatively, the registrations for the groupings is attached as **Exhibit C.**

25.     Each of Plaintiffs' Copyrighted Compositions was registered within three months of publication, and satisfies the registration prerequisite under 17 U.S.C. 412(c).

## Defendant SLACKER

26.     Slacker Radio is an online music streaming service available in the U.S. and Canada.  Listeners can access the service on the web and through mobile apps on multiple smartphones. It allows users to create and share customized music stations. Slacker allows users to customize one of their programmed stations (for instance, Today's Hits) or start with music similar to an artist or song, and then customize a station,

### Levels of Service

27.     The free Slacker Basic Radio user account is an advertisement-supported service. It allows registered users to have free access to basic features, and works on all Flash-enabled web browsers. Ads last thirty-to-sixty seconds and occur every four-to-five songs.

28.     In addition to its free, ad-supported service, Slacker offers additional levels of subscription service:

29.     Slacker Radio Plus adds station caching to multiple mobile phones, unlimited skips and song requests, no audio or banner advertisements, full lyrics, and the ability to turn off DJs on stations.

30.     Slacker Radio Premium has all the features of the Plus tier (only allows station caching on one device), adding the ability to create playlists and play selected songs on demand, similar to a traditional MP3 player. This tier was added in May 2011.

31.     Slacker mobile apps work with the free Slacker Basic Radio service and Slacker Radio subscription services on iPhone, iPod touch, WebOS, Android, BlackBerry, Windows Mobile 6.x & Windows Phone 7.x/8.x smartphone platforms, and Windows 8.x/RT. The applications provide playback from 3G or WiFi connections. Features such as station creation, recently played stations, fine-tune options, artist biographies, photos, album art, reviews, station caching and lyrics (for Slacker Radio Plus or Premium subscribers) are available on the mobile applications as well.

## SUB-CLASS I FACTS – SLACKER'S SYSTEMATIC INFRINGEMENT

32.     Plaintiffs and the Putative Class own the mechanical rights to musical compositions in the United States.  Each of Plaintiffs' and the Putative Class' Copyrighted Compositions was registered within three months of publication, or one month after publication on Defendant's SLACKER Music system, and satisfies the registration prerequisite under 17 U.S.C. 412(c).

33.    Pursuant to the Copyright Act, Plaintiff and the Putative Class possess exclusive rights regarding the reproduction and/or distribution of the Copyrighted Works, including the associated licensing rights to such activities.

34.    Plaintiffs and the Putative Class distribute, sell and/or license the Copyrighted Works in the form of CDs, and other tangible media throughout the United States, including in New York.  Plaintiffs and the Putative Class reproduce, distribute, sell, and/or license the copyrighted Works in the form of digital audio files delivered and performed via the Internet.

35.    Plaintiffs and the Putative Class have invested and continue to invest substantial money, energy, time, effort and creative talent to create and develop the Copyrighted Works.

36.    Defendant SLACKER's interactive commercial music streaming service can be found at <http://: www. SLACKER.com>, permitting users to customize listening choices for recorded music.  Its Internet services are downloadable to computers and handheld devices (via mobile applications) making its streaming capabilities widely available to millions of users.

37.    With the SLACKER Music system, the user can stream and download music as well as create playlists and artist based stations for the users tablet, PC, TV and phone. SLACKER Music makes the Copyrighted Works available for stream or download.

38.    Indeed, SLACKER has optimized its website for use on iOS and Android-based devices thereby reaching vast markets of users.

39.    Defendant SLACKER's website is currently one of the most frequently visited and used interactive streaming music sites on the Internet and its boast of 40 million tracks makes it the largest music library in the industry.

40.     Defendant SLACKER's Internet music service is intended to and does promote SLACKER's services in a manner designed to attract users and paid subscribers of its services.

41.     Defendant SLACKER regularly reproduced and/or distributed to listeners and users of its services Plaintiffs' and Putative Class Members' musical compositions, and has done so repeatedly for at least the past three years.  SLACKER created its now 12 million track library by dumping all of the music from independent artists onto the SLACKER Service without serving NOIs.  Independent artists are predominantly impacted by SLACKERS's systematic infringement because they are usually not member of Harry Fox.

42.     In the course of rendering its streaming services to users and subscribers, Defendant SLACKER reproduced and/or distributed Plaintiffs' and the Putative Class Members' musical compositions millions of times.

43.     Defendant SLACKER has not licensed Plaintiffs' and the Putative Class Members' musical compositions or otherwise received authorization from them to reproduce or distribute such works to its users and subscribers.

44.     SLACKER's unlawful reproduction and/or distribution of Plaintiffs' and Putative Class Members' copyrighted works has substantially harmed and continues to harm Plaintiffs and the Putative Class.

45.     A non-exhaustive and illustrative list of Plaintiffs' Copyrighted Works that SLACKER has illegally reproduced and/or distributed for its users, includes, but is not limited to those identified in **Exhibits A, B,** and **D**.  Plaintiff has received Certificates of Copyright Registration from the Register of Copyrights for each of their Copyrighted Works.

46.     The Copyright Act provides statutory penalties to discourage SLACKER's

infringement, including statutory damages awards of between $750 and $30,000 for each

infringed work, and up to $150,000 for a willful infringement.

47.     Defendant SLACKER's willful infringement here is subject to up to $150,000 per

copyright registration for all compositions registered within three months of publication or

within 30 days after being made available on SLACKER's Music system.

### SUB-CLASS II FACTS - SLACKER'S UNDERCALCULATION OF ROYLTIES

48.     Every month for over three years, somewhere between 10% – 30% of the money

owed to songwriters/publishers is not paid by Defendant SLACKER.

49.     Of the money that is paid, in many cases it is being paid to the wrong entity due to

wrong data.

50.     Pursuant to 37 C.F.R. § 385.12-13, there is a forth a four step process for the

determination of the royalty rate.

51.     Uses subject to the promotional royalty rate shall be excluded from the calculation

of royalties due, as further described in § 385.13.  SLACKER routinely violates the promotional

royalty rate by allowing free streaming well in excess of 30 days.

52.     When determining the "Payable Royalty Pool", Defendant SLACKER was

obligated to determine "the amount payable for the reproduction and distribution of all musical

works used by the service ***by virtue of its licensed activity for a particular offering*** during the

accounting period."  By including tens of millions of unlicensed streams in Payable Royalty

Pool, Defendant impermissibly reduced the per-stream rate.

53.     SLACKER was obligated to calculate the "Per-Work Royalty Allocation" for "Each Relevant Work".  This is the amount payable for the reproduction and distribution of each musical work used by the service by virtue of its ***licensed activity*** through a particular offering during the accounting period.  The inclusion of unlicensed activity which SLACKER did not pay royalties impermissibly reduced the "Per-Work Royalty Allocation".

54.     Further, "[t]he allocation shall be accomplished by dividing the payable royalty pool determined in step 3 for such offering by the total number of plays of all musical works through such offering during the accounting period (other than promotional royalty rate plays) to yield a per-play allocation."  Again, SLACKER deliberately miscalculated the "Per-Play Allocation".

55.     SLACKER has also failed to disclose its statutory obligation of the percentage of service revenue which should be 10.5% and, upon information and belief, has underreported its revenue.

56.     By statute, Defendant SLACKER failed to make "the calculations required by paragraph (b) of this section shall be made in good faith and on the basis of the best knowledge, information and belief of the licensee at the time payment is due, and subject to the additional accounting and certification requirements of 17 U.S.C. 115(c)(5) and § 201.19 of this title."

57.     Defendant SLACKER failed to provide to Plaintiffs and the Putative Class "a statement[] of account which shall set forth each step of its calculations with sufficient information to allow the copyright owner to assess the accuracy and manner in which the licensee determined the payable royalty pool and per-play allocations (including information

sufficient to demonstrate whether and how a minimum royalty or subscriber-based royalty floor pursuant to § 385.13 does or does not apply) and, for each offering reported, also indicate the type of licensed activity involved and the number of plays of each musical work (including an indication of any overtime adjustment applied) that is the basis of the per-work royalty allocation being paid."

58.     Each month, Defendant SLACKER provided a list of every stream of sound recording that occurred in the digital music service in that month to a third party company. This list is called a "Usage Log."

59.     The third party company must: (i) match the sound recording to the composition; (ii) match the composition to the publishing administrator; (iii) have a name, address and other contact information for the publisher; (iv) run the royalty formula; and (v) provide the statements and the interactive mechanical royalty payments to the music publisher administrator on time.

60.     Upon information and belief, they are only able to match/map and pay Interactive Streaming Mechanical royalties on 70% to 85% of the sound recordings in the interactive music service's usage log.  This means each month, since the launch of the first interactive streaming service 3 years ago, 15% to 30% of the money owed to publishers for Interactive Streaming Mechanical royalties has never been paid out, which includes Plaintiffs and the Putative Class.

61.     Moreover, the royalty formula for the per-stream rate includes all of the streams that Defendant SLACKER is not paying royalties.  This allows Defendant SLACKER to impermissibly reduce the per-stream rate for those artists it does pay royalties.

62.     As part of its regular business practice, Defendant SLACKER intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the Copyright Act and the Copyright Revisions Act 17 U.S.C. §§ 501 et seq.

## CLASS ALLEGATIONS SUB-CLASS I

63.     Plaintiffs brings this action on behalf of themselves and on behalf of all other similarly situated owners of mechanical rights for registered musical compositions, which rights were improperly infringed by SLACKER's unlicensed and/or unauthorized reproduction and/or distribution of those compositions.

64.     SUB-CLASS I is comprised of and defined as follows:

> "All owners of mechanical distribution and reproduction rights in musical compositions registered under United States federal law, which compositions were reproduced or distributed by SLACKER without license or authorization since February 22, 2013 and were registered within 90 days of first publication or 30 days of being uploaded, distributed and reproduced on SLACKER Music."

65.     This action may be properly brought and maintained as a class action because there is a well-defined community of interest in the litigation and the members of the proposed class are clearly and easily ascertainable and identifiable.

66.     The class for whose benefit this action is brought is so numerous that joinder of all class members is impracticable.  Plaintiffs are informed and believe that there are thousands of class members and that those class members can be readily ascertained from Defendant SLACKER's database files and records, and via discovery in this action.

67.     Upon information and belief, Defendant SLACKER has maintained records of the musical compositions it reproduces or distributes.

68.     The Putative Class Members can be readily located and notified of this action.

69.     The claims of Plaintiffs are typical of the claims of the members of the Putative Class, and his interests are consistent with and not antagonistic to those of the other Putative Class members they seek to represent.

70.     Plaintiffs hold the rights to many copyrighted musical compositions which SLACKER has reproduced and/or distributed without license and without providing notification to Plaintiffs.

71.     Plaintiffs, and all members of the Putative Class, have sustained actual pecuniary loss and face irreparable harm arising out of SLACKER's continued infringement as complained of herein.

72.     Plaintiffs have no interests that are adverse to, or which conflict with, the interests of the absent members of the Putative Class and is able to fairly and adequately represent and protect the interests of such a class.

73.     Plaintiffs have raised a viable copyright infringement claim of the type reasonably expected to be raised by members of the Putative Class, and will vigorously pursue those claims.

74.     If necessary, Plaintiffs may seek leave of the Court to amend this Second Amended Complaint to include additional class representatives to represent the Putative Class or additional claims as may be appropriate.

75.     Plaintiffs are represented by experienced, qualified and competent counsel who is committed to prosecuting this action.

76.     Common questions of fact and law exist as to all members of the class that predominate over any questions affecting only individual members of the class.

77.     These common legal and factual questions, which do not vary from class member to class  member, and which may be determined without reference to the individual circumstances of any class member include, without limitation, the following:

(a)  whether SLACKER reproduced or distributed or otherwise exploited via its SLACKER Music service registered musical compositions without first obtaining a license or other required authorization;

(b)  whether SLACKER's reproduction, distribution or other exploitation of registered musical compositions without first obtaining a license or other required authorization constitutes a violation of the Copyright Act, 17 U.S.C. §§ 106 and 501;

(c)  whether SLACKER's unauthorized reproduction, distribution or other exploitation of registered musical compositions was done willfully, thereby entitling the members of the class to increased statutory damages;

(d)  whether SLACKER violated of New York's General Business Law §  349 for unfair and unlawful business practices;

(d)  whether SLACKER's violation of New York's General Business Law §  349 is continuing, thereby entitling Class Members to injunctive or other relief;

(e)  the basis and method for determining and computing damages; and,

(f)  whether SLACKER's conduct is continuing, thereby entitling Plaintiffs and Members of the class to injunctive or other relief.

78.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual litigation of the claims of all class members is impracticable.

79.     The claims of the individual members of the class may range from smaller sums to larger sums, depending upon the number of infringements.  Thus, for those Putative Class members with smaller claims, the expense and burden of individual litigation may not justify pursuing the claims individually.  Even if every member of the class could afford to pursue

individual litigation, which is highly unlikely in the independent artist community, the court system could not.

80.    It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, contradictory, or inconsistent judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.

81.    On the other hand, the maintenance of this action as a class action presents few management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each member of the class.

82.    Plaintiffs anticipate no difficulty in the management of this action as a class action.

## CLASS ALLEGATIONS SUB-CLASS II

83.    Plaintiffs brings this action on behalf of themselves and on behalf of all other similarly situated owners of mechanical rights for registered musical compositions, which rights were improperly infringed by SLACKER's unlawful reduction in the Payable Royalty Rate

84.    SUB-CLASS II is comprised of and defined as follows:

> "All owners of mechanical distribution and reproduction rights in musical compositions registered under United States federal law, which compositions were reproduced or distributed by SLACKER since February 22, 2013 and received royalty payments for SLACKER's distribution and reproduction through its SLACKER Music system."

85.     This action may be properly brought and maintained as a class action because there is a well-defined community of interest in the litigation and the members of the proposed class are clearly and easily ascertainable and identifiable.

86.     The Putative Class for whose benefit this action is brought is so numerous that joinder of all class members is impracticable.  Plaintiffs are informed and believe that there are thousands of class members and that those class members can be readily ascertained from Defendant SLACKER's database files and records, and via discovery in this action.

87.     The members of SUB-CLASS II are so numerous that joinder of all members is impracticable. While the exact number of Putative Class members is unknown at the present time, it is estimated that there are thousands of members in the Putative Class.

88.     Despite the numerical size of the Putative Class, the identities of the Putative Class members can be ascertained by mapping.  Plaintiffs and their counsel do not anticipate any difficulties in the management of this action as a class action.

89.     Plaintiffs will fairly and adequately represent the interests of the Class.  Plaintiffs are committed to vigorously prosecute this action and have retained competent counsel experienced in class action litigation.  Plaintiffs are Class members and have no interests antagonistic to or in conflict with other Putative Class members. Plaintiffs are represented by lawyers who have had extensive experience in prosecuting class actions and will adequately represent the Putative Class in this action.

90.     Upon information and belief, Defendant SLACKER maintained records of the musical compositions it reproduces or distributes.

91.     The Putative Class Members can be readily located and notified of this action.

92.     The claims of Plaintiffs are typical of the claims of the members of the class, and their interests are consistent with and not antagonistic to those of the other class members they seek to represent.

93.     Plaintiffs and the Putative Class hold the rights to many copyrighted musical compositions which SLACKER has reproduced and/or distributed without license and without proper payment of royalties or accounting for those royalties.

94.     Plaintiffs and all members of the Putative SUB-CLASS II have sustained actual pecuniary loss and face irreparable harm arising out of SLACKER's systematic and unlawful diminution of the royalty payments with accounting for those payments as described herein.

95.     Plaintiffs have no interests that are adverse to, or which conflict with, the interests of the absent members of the Putative Class members and is able to fairly and adequately represent and protect the interests of such a class.

96.     Plaintiffs have raised a viable claim of the type reasonably expected to be raised by members of the class, and will vigorously pursue those claims.

97.     If necessary, Plaintiffs may seek leave of the Court to amend this Second Amended Complaint to include additional class representatives to represent the class or additional claims as may be appropriate.

98.     Plaintiffs are represented by experienced, qualified and competent counsel who are committed to prosecuting this action.

99.     Common questions of fact and law exist as to all members of the class that predominate over any questions affecting only individual members of the class.

100.    These common legal and factual questions, which do not vary from class member to class member, and which may be determined without reference to the individual circumstances of any class member include, without limitation, the following:

(a)  whether SLACKER made accurate royalty payments for the musical compositions it reproduced or distributed;

(b)  whether SLACKER routinely violates the promotional royalty rate by allowing free streaming well in excess of 30 days;

(c)  whether SLACKER impermissibly reduced the Royalty Rate Pool by the inclusion millions of unlicensed (and uncompensated) streams;

(d)  whether SLACKER impermissibly reduced the Per-Work Royalty Allocation for Each Relevant Work by the inclusion of unlicensed activity.

(e)  whether SLACKER impermissibly calculated the Per-Play Allocation;

(f)  whether SLACKER failed to disclose its statutory obligation of the percentage of service revenue which should be 10.5%;

(g)  whether SLACKER failed to make the calculations required in good faith and on the basis of the best knowledge, information and belief of the licensee at the time payment is due, and subject to the additional accounting and certification requirements of 17 U.S.C. 115(c)(5) and § 201.19.

(h)  whether SLACKER failed to provide a statement of account which shall set forth each step of its calculations with sufficient information to allow the copyright owner to assess the accuracy and manner in which the licensee determined the payable royalty pool and per-play allocations (including information sufficient to demonstrate whether and how a minimum royalty or subscriber-based royalty floor pursuant to § 385.13 does or does not apply) and, for each offering reported, also indicate the type of licensed activity involved and the number of plays of each musical work (including an indication of any overtime adjustment applied) that is the basis of the per-work royalty allocation being paid;

(i)  whether SLACKER failed to provide an accurate list of every stream of a sound recording that occurred in the digital music service in that month to these third party companies;

(j)  the basis and method for determining and computing damages; and,

(k)  whether SLACKER's conduct is continuing, thereby entitling Plaintiffs and the Members of the Putative Class to injunctive or other relief.

101.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual litigation of the claims of all class members is impracticable.

102.    The claims of the individual members of the class may range from smaller sums to larger sums, depending upon the number of infringements.  Thus, for those class members with smaller claims, the expense and burden of individual litigation may not justify pursuing the claims individually.  Even if every member of the class could afford to pursue individual litigation-which is highly unlikely in the independent artist community-the court system could not.

103.    It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, contradictory, or inconsistent judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.

104.    On the other hand, the maintenance of this action as a class action presents few management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each member of the class.

105.    Plaintiffs anticipate no difficulty in the management of this action as a class action.

**COPYRIGHT INFRINGEMENT FACTS APPLICABLE TO NAMED PLAINTIFFS**

106.    As a general proposition, a copyright confers on the owner the exclusive right to reproduce the copyrighted work.

107.    Absent a license from the copyright owner, which the owner is free to grant or deny, reproduction of the work by another constitutes copyright infringement.

108.    When Congress enacted the Copyright Act of 1909, it was concerned that exclusivity with respect to musical compositions would give rise to "a great music monopoly." It therefore modified the principle of exclusivity in the case of nondramatic musical works by enacting a compulsory license provision which, in defined circumstances, imposed upon the copyright owner a license permitting the mechanical recording of the copyrighted song "on such media as a phonograph record or a piano roll."

109.    Although recording technology has changed since 1909, licenses to record musical compositions on such media continue to be called "mechanical licenses."

110.    The compulsory mechanical license concept was carried forward in Section 115 of the Copyright Act of 1976 which, generally speaking, permits one wishing to record a copyrighted nondramatic musical work to do so in the absence of the copyright owner's consent in exchange for payment of a statutory royalty.  But the availability of compulsory mechanical licenses is dependent on the strict limitations of Section 115(b)(1) of the Act which requires in pertinent part that "[a]ny person who wishes to obtain a compulsory license under this section shall, before or within thirty days after making, and before distributing any phonorecords of the work, serve notice of intention to do so on the copyright owner."

111.    Under Section 115, the consequences of any lapse are severe: "failure to serve or file the notice required by clause (1) forecloses the possibility of a compulsory license and, in the

absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement ..."

112.    A 2015 objective analysis of the RIAA numbers showed that 54% of all U.S. streaming music revenue was generated by ad-supported listening in the January to June period and 46% came from subscriptions. RIAA numbers show that $478 million was generated in the first six months of 2015 by subscriptions – $72 million less than advertising.

113.    SLACKER holds direct contracts concerning royalty payments with the major labels.  SLACKER pays a percent of their total revenue to royalty holders and is unaffected by Copyright Royalty Board rate changes.

114.    SLACKER is an expert on the NOI process and royalty rates.  The CTIA represents wireless carriers; and various individual digital music services offering digital phonorecord deliveries such as Apple, Rhapsody International, and Slacker.

115.    The CTIA has lobbied the Copyright Royalty Board on procedures for service of NOIs and royalty rates.

116.    This group of Webcasters won a major victory in 2009.  The Copyright Royalty Board amended the implementing regulations for Section 115 by including a provision that allows for the service of the Notice of Intent for a Compulsory License ("NOI") on the U.S. Post Office if the rights user was unable to locate the rights holder. See 37 C.F.R. 285.2(f).

117.    When Defendant SLACKER launched its interactive product, it elected not to comply with the very legislation it negotiated.

118.    The decision was unquestionably intentional.  SLACKER hired Music Reports to operate as its administrator for NOIs.  As the chart in the NOI section of this Complaint shows, Music Reports failed to serve timely NOIs for any track of Plaintiffs distributed through the SLACKER Service.

119.    The failure to serve the notice of intention before the start of distribution precludes the creation of a compulsory license, and it does so both as to copies distributed prior to service and as to copies distributed thereafter.

120.    The tremendous power granted to Defendant under Section 115 is balanced by the strict obligations regarding notice.  Defendant intentionally failed to adhere to its Section 115 obligations, while enjoying all of the benefits afforded by Section 115.

## FACTS APPLICABLE TO YESH

121.    YESH consists of two men who have been professional musicians since they were 16 years old.  In fact, at 16 years old, John Emanuele and Rich Cupolo played at CBGB and recorded and released two EPs.  While attending Townsend Harris High School in Queens, Emanuele and Cupolo won the Bertlesmann Songwriting contest.  Since they were 25 years old, Emanuel and Cupolo, now thirty, have exclusively earned their living from exploiting their Copyrighted Compositions.

122.    Digital downloads represent 50% of the money generated from the Copyrighted Compositions.  The other 50% comes from licensing for varied uses including motion pictures, commercials, and video games.  Examples of some of the licensed uses are as follows:

| Motion Pictures | Production Company |
|---|---|

| | |
|---|---|
| Extremely Loud & Incredibly Close | Warner Brothers |
| Up In The Air | Paramount Pictures |
| Coast Modern | Two Fold Film |
| Damnation | Felt Soul Media |
| Eastern Rises | Felt Soul Media |
| Officer Down | Felt Soul Media |
| Yami no Ichi Nichi | Mario Junn |
| Nuclear Family | Ian Hawkins |

| Television Program | Production Company |
|---|---|
| CSI: Miami | CBS/Paramount |
| Spring Watch | Fox Television |
| Nike Battlegrounds | MTV/Viacom |
| Real World/Road Rules | Bunim Murray/MTV |
| Red Band Society | Fox Television |
| Hawthorne | TNT Networks |
| Human Planet | Discovery Network |
| Outside Today | Outside TV |
| Mrs. Eastwood & Co | Bunim Murray/MTV |
| Teen Mom | MTV/Viacom |
| Sixteen and Pregnant | MTV/Viacom |

| | |
|---|---|
| Keeping Up With The Kardashians | Bunim Murray/E Television |
| Alaska: The Last Frontier | Discovery Networks |
| The Vineyard | ABC Family |
| Gott und die Welt | German TV ARD |
| America's Psychic Challenge | Bunim Murray Productions |
| Caged | MTV/Viacom |
| True Life | MTV/Viacom |
| This Is How I Made It | MTV/Viacom |
| TO Show | VH1/Viacom |
| Styl'd | MTV/Viacom |
| Life of Ryan | MTV/Viacom |
| If You Really Knew Me | MTV/Viacom |
| Taboo Nation | National Geographic |
| Shahs of Sunset | Ryan Seacrest Productions |
| How I Rock It | Ryan Seacrest Productions |
| Popland | MTV/Viacom |

| Commercials | Company |
|---|---|
| Infiniti Automobile | Infiniti Automobiles |
| Samsung Smart TV | Samsung |
| GoPro Camera | GoPro Cameras |
| Elle Magazine UK \| Dubai Teaser | Elle Magazine UK |
| Pre-Auction Statement | Leonardo DiCaprio Foundation |
| Subaru Online Advertisement | Subaru (Switzerland) |
| Burton Snowboard | Burton Snowboards |
| O'Neill Europe Advertisements | O'Neill Europe |
| Dove | Dove |
| DC Shoes | DC Shoes |

| | |
|---|---|
| Converse Web | Converse |
| NBA Playoffs Commercial | ESPN |
| CanonOptics Advertisement | CanonOptics/Burton |
| Telluride Tourism Board | Telluride Tourism Board |
| Unit Clothing | Unit Clothing Enter. |
| Viasat Baltics | Viasat Baltics |
| Morgan Stanley | Morgan Stanley/Chief Ent. |

| Video Game | Company |
|---|---|
| The Amazing Spiderman | Activision |

123.    Plaintiff Yesh is the sole beneficiary of all right, title and interest in, and to, the copyrighted compositions identified in **Exhibits A, C,** and **D.**

124.    As **Exhibit A, B,** and **C** to this Complaint demonstrates, Plaintiff YESH has complied with all laws pertinent to the Copyrighted Compositions as a copyrighted work and, in particular, has applied for and received the Certificates of Copyright Registration from the Register of Copyrights for the Copyrighted Compositions.

125.    Defendant began distributing one hundred twenty three (123) musical compositions of Plaintiff YESH identified in **Exhibit D**, which were covered by 116 copyright registrations as shown in **Exhibit A,** and alternatively, **Exhibit C**.  Defendant failed to serve an NOI for any recording.

126.    Plaintiff YESH made numerous submissions of groups of tracks, for review by SLACKER.

127.    Pursuant to Plaintiff YESH's agreement with TuneCore, Plaintiff checks a box that says "Deliver Here" which guarantees nothing but an audition with the selected digital store. Defendant SLACKER was one of the "selected stores" chosen by Plaintiff to be sent the master audition recordings of the Copyrighted Compositions.

128.    The license for the physical sound recordings here -- Master Recording License -- was granted to SLACKER through TuneCore.  TuneCore functions like a music label, allowing artists to submit the master recordings through TuneCore to various "Digital Stores" for review.

129.    At no time did TuneCore hold itself out as conveying a mechanical license for the compositions submitted on behalf of Plaintiff YESH.  Further, it is axiomatic that a mechanical license to record and distribute the songs must be obtained in order to lawfully make the recordings available for temporary stream or permanent download.

130.    Defendant SLACKER did not serve an NOI for any of the forgoing recordings, instead it dumped the recordings into its library, with complete disregard for the rights of Plaintiff YESH.

131.    After receipt of the master audition recordings, Defendant SLACKER may elect to exploit the masters, or reject one or all of the sound recordings due to "technical or editorial specifications."

132.    Defendant had the option to upload some or all of the copyrighted works onto SLACKER Music.  For every copyrighted recording Defendant elected to upload onto its service, it was required to serve a Notice of Intent for a Compulsory License ("NOI") within 30 days of upload.

133.    Defendant SLACKER did elect to exploit the sound recordings of the Copyrighted Compositions, but elected to do so with no license or authority.  Defendant SLACKER failed to obtain mechanical licenses for the two hundred and seventy (270) tracks on the SLACKER Music system under 17 U.S.C. § 115 for the distribution of the musical works.

134.    The failure to serve timely NOIs renders the distribution of the Copyrighted Compositions unlicensed and thereby violates my Plaintiffs' exclusive rights pursuant to 17 U.S.C. §§ 106 and 114.

135.    As a result, Defendant lost its right to serve compulsory licenses for Plaintiff YESH's Copyrighted Compositions.  Further, Defendant's failure to comply with Section 115 was done as a matter of cost-cutting business practice, and only an award at the higher end of the statutory framework will serve to curtail Defendant's predatory behavior as detailed below.

136.    Defendant SLACKER knew who the Plaintiff was, after all it listed "Yesh Music" is listed as the record label for the band *The American Dollar* on its website. (Yesh Music was a partnership formed in 2006 which was the predecessor to Plaintiff Yesh Music, LLC.).  Each submission from TuneCore identified the composers and record label.  Defendant uploaded not just Plaintiff's music to its service, but the album cover art and listed the name of the record label – "Yesh Music" and artists.

137.    In less than a few minutes, Defendant SLACKER could have complied with Section 115's notice requirements – the NOIs – but it elected not to as part of a cost-cutting business decision.

138.    Defendant SLACKER was contacted by correspondence from counsel dated June 20, 2015, but elected to ignore Plaintiffs' counsel and continue to stream the Copyrighted Compositions.

139.    SLACKER intentionally infringed YESH's one hundred and sixteen (116) Copyrighted Compositions, by, among other things, making the Copyrighted Compositions available for unlawful and unauthorized digital download and distribution to the public through its interactive Internet subscription music service found at <http://music.SLACkER.com>.

**THE YESH NOIs**

140.    Defendant served 17 NOIs from August 12, 2013 through November 16, 2016.

| NOI Date | Distribution Date | No. of Tracks Covered by NOI | No. of Tracks on SLACKER |
|---|---|---|---|
| 8/12/2013 | 8/21/2013 | 1 | 144 (for over a year) |
| 9/18/2013 | 9/27/2013 | 6 | 144 |
| 10/23/2013 | 11/5/2013 | 1 | 144 |
| 2/18/2014 | 2/18/2014 | 5 | 204 |
| 2/24/2014 | 2/24/2014 | 1 | 204 |
| 3/10/2014 | 3/10/2014 | 5 | 204 |
| 3/24/2014 | 3/24/2014 | 5 | 204 |
| 4/18/2015 | 4/18/2014 | 7 | 204 |
| 5/23/2014 | 5/23/2014 | 5 | 276 |
| 6/8/2014 | 6/18/2014 | 1 | 276 |
| 7/16/2014 | 7/16/2014 | 6 | 276 |

| 8/15/2014 | 8/15/2014 | 4 | 276 |
| --- | --- | --- | --- |
| 9/24/2014 | 9/24/2014 | 18 | 276 |
| 2/10/2015 | 2/10/2015 | 1 | 276 |
| 2/20/2015 | 2/20/2015 | 1 | 276 |
| 10/30/2015 | 10/30/2015 | 2 | 276 |
| 11/16/2015 | 11/16/2015 | 2 | 276 |

141.    Each of the NOIs (attached as **Exhibit E**) failed to account for the vast majority of tracks released in various groupings to Defendant for review.

142.    Not a single NOI was served remotely close to 30 days of the corresponding recording being published by SLACKER.

143.    As a result, Defendant lost its right to serve compulsory licenses for Plaintiff YESH's Copyrighted Compositions.

144.    Each NOI was invalid because it was pre-dated, and not served within thirty (30) days of the two recordings being made available.

145.    All of the NOIs were for "the calendar year" and have expired without renewal.

146.    As of the date of this Complaint, there was not a single valid NOI covering any of Plaintiff YESH's Copyrighted Compositions on SLACKER Service.

147.    On or about June 20, 2015, Defendant SLACKER was contacted by correspondence from Plaintiffs' counsel, and notified that YESH had not received valid NOIs for

any of the musical compositions being streamed on the SLACKER Service; SLACKER did not respond.

148.     In the four months after Defendant was put on notice by counsel, SLACKER continued to stream YESH's one hundred and sixteen (116) Copyrighted Compositions.  This is the definition of "intentional" under 17 U.S.C. § 504(c)(2).  Defendant, acted willfully and wantonly, or at least with reckless disregard to YESH's rights.

149.     Defendant is liable for infringement of YESH's exclusive rights to the Copyrighted Compositions as provided by clauses (1) and (3) of section 106 of the Copyright Act.

150.     Upon information and belief, Defendant made a business decision that it was more cost effective to infringe the copyrights of independent musicians than spend the time and money contacting every rights owner.

## YESH DOES NOT RELEASE COHERENT "ALBUMS"

151.     When a copyright holder or publisher issues material both on an individual basis and as part of a compilation, the Copyright Act permits a statutory damages award for each individual work offered separately.

152.     Only at the very beginning of their career was Plaintiff YESH focused solely on creating traditional albums (cohesive works).

153.     Plaintiff's business model changed early on to focus on licensing individual songs.  The band does not tour.  Instead, it generates revenue from licensing and on-line streaming.

154.    Of the sixteen releases of material by YESH, only seven contained all new tracks. The rest are a mixture of previously released songs, new songs, and old songs remixed to create new licensing opportunities.

155.    For example, the "album" titled "Ambient 3", consists of four original recordings and thirteen remixes of previous recordings.   The one, and only, time this group of seventeen recordings was released together was on September 15, 2012, when it was released to the 31 "digital stores" for consideration.

156.    TuneCore, the entity that submits the recordings, requires all groupings of recordings to be uploaded onto its service as an album.   Plaintiff copyrighted the new and remixed recordings as a group just to protect themselves before releasing them to the public. The individual recordings were copyrighted three months later.

157.    As for a second example, on December 20, 2012, Plaintiff released two "albums" along with ten unrelated recordings to 31 digital stores for consideration.   All of these recordings were previously released in other groupings or were re-worked singles.

158.    As for third example, on December 10th, 2013, Plaintiff released fifty recordings to twenty six digital stores, fifteen of those recordings were also included in the September 15, 2012 grouping.   The rest of the tracks were from earlier recordings or were re-worked singles.

159.    As for a fourth example, on December 12th, 2013, Plaintiff released ten recordings to 31digital stores.  Four of those recordings were included in the September 15, 2012 grouping, the rest were re-released singles.

160.    The shuffling of previous recordings is part of a necessary for Plaintiff's business model, and is designed to increase licensing revenue.  The mere fact that the recordings are shuffled is strong evidence they were not meant to be a logical or cohesive unit.

161.    Plaintiff's three "ambient" releases were marketing releases consisting mainly of remixes from previous albums, varied in nature, designed to increase licensing opportunities for the individual works.

162.    Plaintiff YESH does not have "albums" in the traditional sense, but releases collections of individual songs which are not an integrated work.  For that reason, numerous musical compositions appear in three or four of the collections submitted.

163.    For example, of the 13 collections of songs released by Plaintiff YESH, only 5 have been totally original music.  The rest are mixtures of previously released songs, and re-worked songs.  This is done in order to showcase various recordings for possible licensing deals.

164.    None of the collections is meant to be a cohesive unit; instead, they are constantly shuffled like a deck of cards and re-released.

165.    In fact, Plaintiff YESH affirmatively avoids any of the musical compositions being associated with any other, because this diminishes the licensing opportunities which is 50% of Plaintiff YESHs income.  There is a great need by Plaintiff YESH to create new opportunities for various licensing entities to become aware of the individual tracks.

166.    Tellingly, songs re-released on the numerous compilation albums are often streamed by users far more times than the original release.

167.    Accordingly, no grouping can possibly be considered a coherent unit.

## FACTS APPLICABLE TO PLAINTIFF JOHN K. EMANUELE

168.    Plaintiff EMANUELE had two collections of music on SLACKER Music.  The first collection, titled *Filmmuzic*, had 19 tracks and was made available to Defendant on or about November 2012.  *Filmmuzic* was released in February 2011 and the Copyright Registration date is May 27, 2011.  The second collection, titled *Complete Discography 2009-2013*, was made available by Defendant on or about April 9, 2013, and contained 90 songs.  The Registration date is February 20, 2013. See **Exhibit B**.

169.    Pursuant to Plaintiff's agreement with TuneCore, Plaintiff checks a box that says "Deliver Here" which guarantees nothing but an audition with the selected digital store.  In or about November 2012, Defendant SLACKER was one of the "selected stores" chosen by Plaintiff to be sent the master audition recordings of the Copyrighted Compositions.

170.    At no time did TuneCore hold itself out as conveying a mechanical license for the compositions submitted on behalf of Plaintiff.  Further, it is axiomatic that a mechanical license to record and distribute the songs must be obtained in order to lawfully make the recordings available for temporary stream or permanent download.

171.    Defendant had the option to upload some or all of the copyrighted works onto SLACKER Music.  For every copyrighted recording Defendant elected to upload onto its service, it was required to serve a Notice of Intent for a Compulsory License ("NOI") within 30 days of upload; it did not.

172.    Defendant SLACKER did elect to exploit the sound recordings of the Copyrighted Compositions, but elected to do so with no license or authority.  Defendant

SLACKER failed to obtain mechanical licenses under 17 U.S.C.§ 115 for the distribution of the

musical works.

173.    Defendant failed to serve an NOI on Plaintiff Emanuele for any recording at any

time.

174.    Defendant cannot be heard to argue that it has infringed both Registered

Copyrights of John K. Emanuele.

175.    Plaintiff EMANUELE is the sole beneficiary of all right, title and interest in, and

to, the copyrighted compositions identified in **Exhibit B.**

176.    SLACKER did not serve an NOI for any of the forgoing recordings.  Instead it

dumped the recordings into its service, with complete disregard for the rights of Plaintiffs.

177.    As of the date of this Complaint, there was no NOI covering any of the

EMANUELE'S Copyrighted Compositions on SLACKER Music.

178.    The failure to serve timely NOIs renders the distribution of the Copyrighted

Compositions unlicensed and thereby violates my Plaintiffs' exclusive rights pursuant to 17

U.S.C. §§ 106 and 114.

179.    As a result, Defendant lost its right to serve compulsory licenses for Plaintiff

EMANUELE's Copyrighted Compositions.  Further, Defendant's failure to comply with Section

115 was done as a matter of cost-cutting business practice, and only an award at the higher end

of the statutory framework will serve to curtail Defendant's predatory behavior as detailed

below.

180.    Defendant SLACKER knew who Plaintiff EMANUELE was; after all it listed "John Emanuele" on its website.  Each submission from TuneCore identified the composers and record label.  Defendant uploaded not just Plaintiff's music to its service, but the album cover art and listed the name of the record label.

181.    In less than a few minutes, Defendant SLACKER could have complied with Section 115's notice requirements – the NOIs – but it elected not to as part of a cost-cutting business decision.

182.    Defendant SLACKER was contacted by correspondence from counsel dated June 20, 2015, but elected to ignore Plaintiff EMANUELE's counsel and continued to stream the Copyrighted Compositions.

183.    In the four months after Defendant was put on notice by counsel, SLACKER continued to stream EMANUELLE's tracks covered by two (2) Copyright Registrations.  This is the definition of "intentional" under 17 U.S.C. § 504(c)(2).  Defendant, acted willfully and wantonly, or at least with reckless disregard to YESH's rights.

184.    SLACKER intentionally infringed EMANUELE's two (2) Copyright Registrations, by, among other things, making the underlying Copyrighted Compositions available for unlawful and unauthorized digital download and distribution to the public through its interactive Internet subscription music service.

185.    Defendant is liable for infringement of EMANUELLE's exclusive rights to the Copyrighted Compositions as provided by clauses (1) and (3) of section 106 of the Copyright Act.

186.     Upon information and belief, Defendant made a business decision that it was more cost effective to infringe the copyrights of independent musicians than spend the time and money contacting every rights owner.

## FIRST CLAIM FOR RELIEF
## COPYRIGHT INFRINGEMENT

187.     Plaintiffs and the Putative Class incorporate the allegations contained in the preceding paragraphs as if set forth at length here.

188.     Defendant has, without a "mechanical" license under Section 115 from Plaintiffs or the Putative Class, reproduced and publicly performed and/or publicly distributed Plaintiffs' Copyrighted Compositions through its interactive web-based subscription streaming service.

189.     It cannot be disputed that the Plaintiffs and the Putative Class have valid, registered copyrights, and that Defendant has reproduced and offered the Copyrighted Compositions for streaming, including permanent and temporary digital download, without a license, thus infringing Plaintiffs' and the Putative Class' rights under Section 115 of the Copyright Act.  Irreparable injury is presumed here as Plaintiffs and the Putative Class have established a prima facie case of copyright infringement.

190.     Even after Defendant was put on notice, over four months ago, that it had no license or authority, Defendant elected to continue to reproduce and publicly perform and/or publicly distribute Plaintiffs' Copyrighted Compositions through its subscription service.

191.    The making or the distribution, or both, of all Copyrighted Compositions without the payment of royalties is actionable as acts of infringement under section 501 and fully subject to the remedies provided by sections 502 through 506 and 509.

192.    Each time the Plaintiffs and Putative Class were deprived of their statutory royalty entitlement, e.g., by non-payment of royalties, a distinct harm was done to Plaintiffs' and the Putative Class' property interest.

193.    SLACKER's continued streaming of Plaintiff's Copyrighted Compositions, after it was served with notice on June 20, 2015, is clearly an intentional infringement under the Act.

194.    Defendant's predatory conduct was clearly intentional within the meaning of 504(c)(2) for purposes of enhancing statutory damages.  Defendant knew that its actions constituted an infringement each time it failed to serve an NOI or make a royalty payment.

195.    Defendant's knowledge may also be inferred from its conduct including the reckless disregard of the Plaintiffs' and Putative Class' rights (rather than actual knowledge of infringement), which suffices to warrant award of the enhanced damages.

196.    As a direct and proximate result of each of the Defendant's infringement, Plaintiffs and the Putative Class have incurred damages, as described more fully above.  Pursuant to 37 C.F.R. § 385, Plaintiffs and the Putative Class are entitled to a "per stream" statutory royalty rate of $.01 for interactive web-based streaming services like Defendant.

197.    Plaintiffs and the Putative Class may also elect to recover statutory damages pursuant to 17 U.S.C. § 504(c)(2) for willful infringement of up to $150,000, but not less than

$30,000, for each infringement of each copyright registration identified in **Exhibit A** and those that will be produced for the Putative Class, as available under the law.

## SECOND CLAIM FOR RELIEF
## COPYRIGHT INFRINGEMENT

198.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if set forth at length here.

199.    Alternatively, while Plaintiff YESH does not release traditional albums, in the event this Honorable Court finds it does, Defendant SLACKER has intentionally infringed the Copyright Registrations identified in **Exhibit B** for the collections of compositions registered to Plaintiffs.

200.    Defendant has, without a "mechanical" license under Section 115 from Plaintiffs, reproduced and publicly performed and/or publicly distributed Plaintiffs' Copyrighted Compositions through its interactive web-based subscription streaming service.

201.    It cannot be disputed that the Plaintiffs have valid, registered copyrights, and that Defendant has reproduced and offered the Copyrighted Compositions for streaming, including permanent and temporary digital download, without a license, thus infringing Plaintiffs' rights under Section 115 of the Copyright Act.  Irreparable injury is presumed here as Plaintiffs have established a prima facie case of copyright infringement.

202.    Even after Defendant was put on notice, over four months ago, that it had no license or authority, Defendant elected to continue to reproduce and publicly perform and/or publicly distribute YESH's Copyrighted Compositions through its subscription service.

203.    The making or the distribution, or both, of all Copyrighted Compositions without the payment of royalties is actionable as acts of infringement under section 501 and fully subject to the remedies provided by sections 502 through 506 and 509.

204.    Each time the Plaintiffs were deprived of their statutory royalty entitlement, e.g., by non-payment of royalties, a distinct harm was done to Plaintiffs' property interest. Defendant SLACKER's continued streaming of Plaintiff's Copyrighted Compositions, after it was served with notice on June 20, 2015, is clearly an intentional infringement under the Act. Defendant's predatory conduct was clearly intentional within the meaning of 504(c)(2) for purposes of enhancing statutory damages.  Defendant knew that its actions constituted an infringement each time it failed to serve an NOI or make a royalty payment.

205.    Defendant's knowledge may also be inferred from its conduct including the reckless disregard of the Plaintiffs' right (rather than actual knowledge of infringement), which suffices to warrant award of the enhanced damages.

206.    As a direct and proximate result of each of the Defendant's infringement, Plaintiffs have incurred damages, as described more fully above.  Pursuant to 37 C.F.R. § 385, Plaintiffs are entitled to a "per stream" statutory royalty rate of $.01 for interactive web-based streaming services like Defendant.

207.    Plaintiffs may also elect to recover statutory damages pursuant to 17 U.S.C. § 504(c)(2) for willful infringement of up to $150,000, but not less than $30,000, for each infringement of each copyright registration identified in **Exhibit B**, as available under the law.

### THIRD CLAIM FOR RELIEF
**(New York General Business Law §  349 - Deceptive acts and Practices Unlawful.)**

208.     Plaintiffs and the Putative Class reallege and incorporate by reference each and every allegation contained in the preceding paragraphs with the same force and effect as if fully set for that length herein.

209.     On information and belief, Plaintiffs and the Putative Class allege SLACKER: (a) depresses the value of the royalties owed to Plaintiff and the Class Members' for use of their Copyrighted Works through an arbitrary and non-negotiated payment structure; and (b) captures and holds funds which are otherwise distributable and earns interest thereon, thereby profiting off its own unlawful conduct.

210.     These business practices are unlawful and unfair pursuant to New York's General Business Law §  349.

211.     As a direct and proximate result of SLACKER's conduct alleged herein, Plaintiffs and the Putative Class Members are entitled to recover all proceeds and other compensation received or to be received by SLACKER for its failure to pay royalties.

212.     This includes any interest accrued on the royalty funds inappropriately withheld from Plaintiffs and the Putative Class Members.

213.     Plaintiffs and the Class Members have been damaged, and SLACKER has been unjustly enriched, in an amount that is not as yet fully ascertained but which Plaintiffs are informed and believe is not less than $150,000 according to proof at trial.

214.     Unless the Court enjoins and restrains SLACKER's conduct, Plaintiffs and the Putative Class Members will continue to endure great and irreparable harm that cannot be fully

compensated or measured in monetary value alone.  Accordingly, Plaintiff and the putative Class

Members are entitled to temporary, preliminary and permanent injunctions, prohibiting  further

acts  of  unfair  competition  pursuant  to  New York's General Business Law §  349.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and on behalf of all other

persons similarly situated, respectfully prays for relief against Defendant as follows:

1.       Certify this matter as a class action;

2.       Enter an order appointing Plaintiffs as class representative and Plaintiffs' counsel

as class counsel;

3.       Enter judgment in favor of Plaintiffs and the Class;

4.       Enter injunctive and/or declaratory relief as is necessary to protect the

interests of Plaintiffs and the Class (17 U.S.C. § 502), including enjoining

Defendant from continued copyright infringement and violations of the relevant

provisions of the Copyright Act;

5.       A temporary, preliminary, and permanent injunction enjoining and restraining

SLACKER, and its respective agents, servants, directors, officers, principals,

employees, representatives, subsidiaries and affiliates, companies, successors,

assigns, and those acting in concert with them or at their direction, from further

violations of New York's General Business Law §  349;

6.       Injunctive relief that requires SLACKER to pay for the services of a third

party auditor to identify the owners of Works reproduced and/or distributed  by

SLACKER despite SLACKER's failure to first obtain a mechanical license prior

to reproducing and/or distributing the Works, and further requiring SLACKER to

remove all such Works from its services until it obtains proper licenses for them;

7.    Restitution of SLACKER's unlawful proceeds, including Defendant's gross

profits;

8.    Award compensatory damages to Plaintiffs and the Putative Class in an amount to

be ascertained at trial;

9.    Award statutory damages to Plaintiffs and the Putative Class according to proof,

including but not limited to all penalties authorized by the Copyright Act (17

U.S.C. §§ 504(c)(1), 504(c)(2));

10.    Award reasonable attorneys' fees and costs (17 U.S.C. § 505);

11.    Award Plaintiffs and the putative Class pre- and post-judgment interest to the

extent allowable; and,

12.    Award such other and further relief that the Court may deem just and

proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: February 21, 2015                                GARBARINI  FITZGERALD P.C.


By: _Richard M. Garbarini_

Richard M. Garbarini (RG 5496)
250 Park Avenue
7th Floor
New York, New York 10177
Telephone: (212) 300-5358
Facsimile: (347) 218-9479